FILED



# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

2004 MAY 26  P 3: 37

GENEBA GLOVER and JAMES GILLINS,          )
individually as private attorneys general,          )
or alternatively on behalf of a class of all          )
others similarly situated,          )
          )
                    Plaintiffs,          )          Case No.
          )          3:04-cv-403-J-16 mmH
          v.          )          JURY TRIAL DEMANDED
          )
PHILIP MORRIS USA, R.J. REYNOLDS          )
TOBACCO COMPANY, BROWN &          )
WILLIAMSON TOBACCO CORPORATION,          )
individually and as the successor to          )
THE AMERICAN TOBACCO COMPANY,          )
LORILLARD TOBACCO COMPANY, INC.,          )
and LIGGETT GROUP, INC.,          )
          )
                    Defendants.          )

## COMPLAINT

### THE NATURE OF THE CASE

1.     Plaintiffs, Geneba Glover and James Gillins, bring this action as "private

attorneys general" pursuant to the private cause of action provisions of the Medicare as

Secondary Payer ("MSP") statute, 42 U.S.C. § 1395y(b)(3)(A), seeking to recover for the

Medicare program all the expenditures it made from May 26, 1998 to the present for the health

care services received by Medicare beneficiaries for the treatment of certain tobacco-related

diseases, including, but not limited to, lung cancer, heart disease, emphysema, and chronic

obstructive pulmonary disease ("COPD").  Alternatively, the plaintiffs brings this action

individually and on behalf of all members of a proposed class, consisting of Medicare

beneficiaries who have received or are receiving health care services for the treatment of those

tobacco-related illnesses, to recover for the Medicare program all the expenditures it made from May 26, 1998 to the present for the treatment of those tobacco-related diseases.

2.    The MSP statute's function is straightforward: to relieve Medicare of the obligation to pay a beneficiary's medical expenses if payment for covered services has been or is reasonably expected to be made by someone else, called the "primary payer" or the "primary plan."

3.    The defendants are corporations that engage in the business of manufacturing and selling almost all of the cigarettes purchased in this country.  The defendants have operated their businesses pursuant to plans and arrangements by which they have taken out insurance with carriers who carry all or part of the risk of liability for torts resulting from the operation of the defendants' businesses, including torts resulting from smoking the defendants' cigarettes. As such, the defendants have liability insurance policies or plans that are "primary plans" within the meaning of the MSP statute.  To the extent that the defendants have not taken out such liability insurance with carriers or such liability insurance is no longer in force, or to the extent that the liability insurance they have taken out with carriers does not provide payment for all the tort liability resulting from the defendants' products, the defendants operate their businesses pursuant to plans and arrangements by which they carry their own risk of liability for such torts.  As such, the defendants constitute self-insured liability plans that are "primary plans" within the meaning of the MSP statute.

4.    The nicotine in cigarettes is an addictive drug.  While the defendants were aware of this fact, their customers, including the Medicare beneficiaries who have suffered from or are suffering from certain tobacco-related diseases, were not.  Addiction is the key to the injury inflicted by the defendants' cigarettes because it is the prolonged use of cigarettes

that commonly causes these diseases. The defendants not only intentionally concealed this addictive character of their cigarettes, but sought to discredit any information that might bring this addictiveness to light. At the same time, the defendants knowingly manipulated the addictiveness of their cigarettes to enhance its impact on their customers. The Medicare beneficiaries who have suffered from or are suffering from certain tobacco-related diseases as a result of smoking the defendants' cigarettes did not consent to being exposed to the addictive properties of the defendants' cigarettes. Consequently, the defendants are liable in tort, specifically battery, for the health care expenses of the Medicare beneficiaries who have suffered from or are suffering from certain tobacco-related diseases.

5.     As a result of this battery, the defendants are entities that have or had a responsibility under the MSP statute to pay for the health care expenses of the Medicare beneficiaries necessitated by these tobacco-related diseases; that is, their primary plans have failed to provide for primary payment or appropriate reimbursement to Medicare for such expenses. Accordingly, Medicare has been unlawfully and unnecessarily forced to pay enormous sums to diagnose and treat the tobacco-related diseases of Medicare beneficiaries.

6.     The role of the plaintiffs as "private attorneys general" reflects the public importance of this case, especially to the Medicare program and its beneficiaries.

(a)     The 2004 Annual Report of the Medicare Boards of Trustees observes that "[t]he Medicare program is the second-largest social insurance program in the United States, with 41 million beneficiaries and total expenditures of $280.8 billion in 2003." Thus the importance of Medicare as a source of health care funding for tens of millions of Americans cannot be disputed.

3

(b)     The 2004 Report of the Trustees of Medicare also warns that "the projected financial status of Medicare has taken a major turn for the worse" in just the last year. By 2019, according to the Medicare Trustees, the Medicare Hospital Insurance Trust Fund will be bankrupt.

(c)     The MSP regime was codified by Congress in the 1980s to reduce Medicare expenditures, a role all the more essential with Medicare's financial status in such precarious straits. However, enforcement of the MSP regime, especially reimbursement of improper Medicare expenditures from other parties that should have been primary payers, has been disappointing. The Government Accounting Office ("GAO") has reported the lack of progress that has been made in collecting MSP debts, which "arise when Medicare covers expenses related to accidents, malpractice, workers' compensation, or other items not associated with group health plans that are subsequently determined to be the responsibility of another payer." According to the GAO, Medicare "lacks information on the total dollar amount of eligible debts not covered by its current referral instructions to Medicare contractors, and it has not developed a detailed plan or specific time frame for referring these debts." Moreover, Medicare does not even try to collect older MSP debts because it believes it is "not cost-effective to collect them." Indeed, the Justice Department simply does not have the resources to pursue these reimbursement cases on behalf of Medicare.

(d)     Accordingly, Congress added the private right of action for double damages to the MSP statute "to save the government money by giving private citizens incentives to recover funds erroneously paid by Medicare." Even when Medicare itself lacks the information necessary to collect an MSP debt, that information nevertheless exists in the hands

4

of each Medicare beneficiary who may be a tort victim and who, with the incentive provided by the double damages provision of the MSP statute, can be motivated to sue as a "private attorney general" to collect that debt even if it is not cost-effective for Medicare to make the effort, and even if the more cumbersome federal bureaucracy is slow to take action.

(e)     The MSP private right of action, like the *qui tam* provision of the False Claims Act, empowers private citizens to prosecute cases in which the federal government has overpaid. There have been hundreds of *qui tam* cases filed under the False Claims Act each year. In FY 2003, a record $2.1 billion was recovered under the False Claims Act (a 75% increase from FY 2002), and of that sum a staggering 70% was recovered not in suits brought by the government itself but in *qui tam* actions brought by citizens. This case – with reimbursements legally owing to Medicare of billions of dollars – suggests that the promise of the MSP private right of action for recovery of improper Medicare payments may be even greater than the impact of the *qui tam* statute.

(f)     Indeed, Congress has long been committed to the MSP statute having exactly such an impact, as was underscored by the retroactive clarification of the MSP statute Congress just enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003. Congress' clarification (retroactive to 1980 when "self-insured plan" was first added to the MSP statute) provides that "[a]n entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance or otherwise) in whole or in part."

(g)     As the Chair of the Senate Finance Committee (which has jurisdiction over Medicare), Sen. Charles E. Grassley, explained, "when a Medicare beneficiary is injured by

wrongful conduct of another entity, that entity's liability insurance or the entity itself, if it has no insurance, or it might be self-insured, is always required to pay first instead of having the taxpayers pay." The defendants here caused Medicare beneficiaries to be injured by their wrongful conduct, and this case seeks to recover from the defendants the money taxpayers wrongly had to pay for the medical care of those beneficiaries.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 1395y(b)(3)(A), 28 U.S.C. § §1331, 1332, and 1367. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## THE PARTIES

8.    The plaintiffs are Geneba Glover, who is 78 years old, and James Gillins, who is 76 years old, both citizens of Jacksonville in Duval County Florida. The plaintiffs are both Medicare beneficiaries who have been cigarette smokers, who have purchased and smoked the cigarettes sold by the defendants, and who have required health care services for tobacco-related illnesses that have been paid by Medicare.

9.    Defendant Philip Morris USA (Philip Morris) is a Virginia corporation with its principal place of business at 120 Park Avenue, New York, New York. At all relevant times, Philip Morris manufactured, advertised, and sold cigarettes, including Philip Morris, Merit, Cambridge, Collector's Choice, Commander, Marlboro, Benson & Hedges, Virginia Slims, Alpine, Dunhill, English Ovals, Galaxy, Players, Saratoga, Basic, Bristol, Bucks, Chesterfield, Lark, L&M, B&H Menthols, and Parliament cigarettes, throughout the United States.

10.    Defendant R.J. Reynolds Tobacco Company ("RJR" or "Reynolds") is a Delaware corporation with its principal place of business at 401 North Main Street, Winston-Salem, North Carolina. At all relevant times, RJR manufactured, advertised, and sold cigarettes, including Camel, Vantage, Now, Doral, Winston, Sterling, Magna, Monarch, More, Century, Bright Rite, Eclipse, and Salem cigarettes, throughout the United States.

11.    Defendant Brown & Williamson Tobacco Corporation ("B&W") is a Delaware corporation with its principal place of business at 200 Brown & Williamson Tower, Louisville, Kentucky. At all relevant times, B&W manufactured, advertised, and sold cigarettes, including Kool, Raleigh, Barclay, BelAir, Capri, Richland, Laredo, Eli Cutter, GPC, GOC Lights, and Viceroy cigarettes throughout the United States. As a result of its acquisition of American Tobacco Company, B&W has succeeded to the liablilities of American Tobacco either by operation of law, or as a matter of fact. At all relevant times, American Tobacco manufactured, marketed, and sold cigarettes, including, Lucky Strike, Pall Mall, Tareyton, American, Malibu, Montclair, Newport, Misty, Iceberg, Silk Cut, Silva Thins, Sobrania, Bull Durham, and Carlton cigarettes, throughout the United States

12.    Defendant Lorillard Tobacco Company ("Lorillard") is a Delaware corporation with its principal place of business at 714 Green Valley Road, Greensboro, North Carolina. At all relevant times, Lorillard manufactured, advertised, and sold cigarettes, including Old Gold, Kent, Triumph, Satin, Maverick, Max, Spring, Newport and True cigarettes, throughout the United States

13.    Defendant Liggett Group, Inc. (f/k/a Liggett & Myers) is a Delaware corporation with its principal place of business at 100 Maple Lane, Mebane, North Carolina. At all relevant times, Liggett manufactured, advertised, and sold cigarettes, including

Chesterfield, Decade, L & M, Pyramid, Dorado, Eve, Stride, Generic and Lark cigarettes, throughout the United States

## CLASS ACTION ALLEGATIONS

14.    The named plaintiffs brings this action as "private attorneys general" under the MSP statute.  Alternatively, the plaintiffs brings this action as a representative party on behalf of themselves and on behalf of the following Class of similarly situated plaintiffs, who are the Class Members:

(a)    all Medicare beneficiaries who, between May 26, 1998 and the present, have received medical treatment for tobacco-related illnesses, the costs of which care and treatment were paid in part or whole by Medicare; and

(b)    all persons or entities (including estates, representatives, spouses, children, and relatives and others) who, independently or derivatively because of their personal or legal relationship with a person described in subparagraph (a) above, may assert claims against the defendants for reimbursement of cost of treatment for tobacco-related illnesses provided by Medicare.

15.    Excluded from the Class are the defendants herein, any entity in which any of the defendants has a controlling interest, any officers, directors or employees of any of the defendants, and legal representatives, heirs, successors, and assignees of any of the defendants.

16.    The Class of plaintiffs is so numerous that the individual joinder of all its members is impracticable.  During each year at issue in this action, there were approximately 39 million Medicare beneficiaries.  Of these, at least several million received medical treatment for tobacco-related illnesses, the costs of which care and treatment were paid in part or whole by Medicare.

17.    Common questions of law and fact exist as to all Class Members.

18.    The representative party's claims are typical of the claims of the Class Members, all of whom have suffered from tobacco-related illnesses, and subsequently received benefits in the form of medical care and treatment for such illnesses paid by Medicare. The representative party adequately represents the Class because he is a member of the Class and his interests do not conflict with the interests of the Class he seeks to represent. He has retained counsel competent and experienced in the prosecution of complex consumer tort and products liability class actions, and who are also experienced in the litigation of actions under the MSP statute. The representative party intends to prosecute this action vigorously for the benefit of the Class. The interests of the Class Members will be fairly and adequately protected by the representative party and his counsel.

19.    The questions of law or fact common to the Class Members predominate over any questions affecting only individual members. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because

(a)    the interest of the Class Members in individually controlling the prosecution of separate actions is minimal, in large measure because the damages to be awarded are not a function of the individualized injuries of each Class Member;

(b)    this litigation concerns the recovery of sums certain, that is, expenditures made by Medicare, that are distinct from any other claims or remedies to which Class Members may be entitled for individual injuries caused by the defendants;

(c)    the desirability of concentrating the litigation of the claims involved in this case in this forum is high given that the statutory damages sought are based on identifiable expenditures made by Medicare, and securing the complete reimbursement to which the

9

Medicare program is entitled in one action is more efficient, and responds more effectively to

Medicare's needs, than seeking this reimbursement piecemeal as part of litigation brought by

individual Class Members, and

      (d)     the difficulties likely to be encountered in the management of a class action are

minimal given the distinct attributes of this statutory cause of action as a device for securing

reimbursement of funds expended by Medicare.

      20.     Accordingly, if a class action is required for this case at all, the proposed Class

is subject to certification as a class pursuant to Fed. R. Civ. P. 23(b)(3).

**GENERAL ALLEGATIONS**

**A. THE MEDICARE AS SECONDARY PAYER REGIME**

      21.     Under the Medicare program, the federal government pays for certain health

care expenses of the aged (persons over 65 years old), the disabled, and persons suffering from

end stage renal disease.

      22.     From its inception in 1965 until 1980, Medicare generally acted as the primary

payer for all covered health care services rendered to eligible beneficiaries. That is, Medicare

was the payer of first resort, even where some other entity might have been legally obligated to

pay for the health care expenses in a particular case. The sole exception up to 1980 was where

payment for the health care services had been made or could "reasonably be expected to be

made" under a state or federal workers' compensation scheme. In such a case, any Medicare

payment for the services was conditioned on reimbursement from the involved workers'

compensation plan.

      23.     Beginning in 1980, in response to burgeoning expenditures, Congress enacted a

series of amendments now known collectively as the Medicare as Secondary Payer ("MSP")

10

statute.  The MSP statute was designed to reduce Medicare's obligation to make primary payment for covered services – and so conserve the dwindling Medicare Trust Funds -- when another person or entity had a legal obligation to provide or pay for health care services needed by a Medicare beneficiary.

24.    In general, under the terms of the MSP statute, Medicare is a secondary payer to two groups of entities: a) entities who have "a responsibility to make payment" for a Medicare beneficiary's health care costs because of a legal obligation voluntarily assumed, and b) entities who have "a responsibility to make payment" for a Medicare beneficiary's health care costs because of a legal obligation imposed by operation of law.  In either case, any Medicare payment already made must be reimbursed by the entity that legally has the "responsibility to make payment," that is, where that entity has, or is, a "primary plan" that should have paid for the medical expense before Medicare.

25.    A "primary plan" in the context of a legal obligation to pay medical expenses that is voluntarily assumed mainly refers to the health care coverage provided to employees as a benefit of their employment.  That is, when an employer establishes a "group health plan" to pay for certain medical expenses of employees and their families, that group health plan is a "primary plan" under the MSP statute and must pay before Medicare on behalf of the employer.

26.    A "primary plan" in the context of a legal obligation to pay medical expenses that is imposed by operation of law includes "a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance."

11

27.    The MSP statute expressly provides that "[a]n entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance or otherwise) in whole or in part."

28.    The Centers for Medicare and Medicaid Services of the Department of Health and Human Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), the agency to whom Congress has delegated the responsibility to administer and interpret the MSP statute, has by lawful rulemaking provided that "'[p]lan' means any arrangement, oral or written, by one or more entities, to provide health benefits or medical care or assume legal liability for injury or illness."

29.    CMS has by lawful rulemaking also provided that "'[s]elf-insured plan' means a plan under which an individual, or a private or governmental entity, carries its own risk instead of taking out insurance with a carrier."

30.    Reflecting the remedial purpose of the MSP statute, CMS has further provided by lawful rulemaking that a "liability insurance payment" that should be primary to Medicare includes out-of-pocket payments made by an entity that carries liability insurance or is covered by a self-insured plan. CMS recognized that such out-of-pocket payments might be made to avoid reporting an incident to a liability insurer, to pay a required deductible, or for other reasons. CMS expressly concluded that it was not consistent with the MSP statute to allow such payments to escape the mandate of the MSP statute.

31.    Thus, a "self-insured plan" within the meaning of the MSP statute and the governing regulations includes a corporation that has decided not to buy insurance for the legal liabilities or obligations that might be imposed on it, whether or not that decision is written

down, and whether or not the corporation has established reserves to cover such liabilities or obligations.

32.    The MSP statute provides no limitation on the kind of "liability" that might create an obligation to pay for the health care expenses of a Medicare beneficiary, and so makes the entity on whom such liability has been imposed a payer primary to Medicare.  CMS has by lawful rulemaking provided that "'[l]iability insurance' means insurance (including a self-insured plan) that provides payment based on legal liability for injury or illness or damage to property."

33.    To help enforce compliance with the MSP statute and to assure that Medicare would not improperly pay for health care costs that were lawfully the responsibility of other entities like the defendants here, Congress authorized private parties like the plaintiff to bring suit for damages against entities, like these defendants, which have not properly paid primary for the health care costs of Medicare beneficiaries.  In the MSP statute, Congress expressly required recovery in such a private action of damages in an amount double the expenditures of Medicare that should have been paid by such primary plans.

### B. The Defendant Corporations Are Primary Plans

34.    On information and belief, each of the defendants has or had a liability insurance policy or plan (including a self-insured plan), within the meaning of the MSP statute, that covers liability to Medicare beneficiaries for the health care services required by their tobacco-related illnesses.

35.    Insurance in any amount, however, cannot limit the liability the law might impose, and so the purchase of insurance does not fully protect the defendants or their assets from the liability that might be imposed, particularly where, as here, the intentionally wrongful

conduct of the defendants is at issue. As a result, even a defendant which had purchased insurance from a third party is self-insured to the extent that insurance does not fully cover a liability imposed by law.

36.    In addition, some defendants at various times obtained insurance under the best terms they could, such as one policy under which defendant Philip Morris retained the risk of $1 million for each occurrence, with an overall cap on the liability insured of $10 million. At other times, the cost of insurance was, from the perspective of some of the defendants, prohibitively expensive in light of what they saw to be their risks, compared to what insurance underwriters saw as the defendants' risks.

37.    To the extent that the defendants are not insured for the liability claimed in this action, they are entities "that engage[] in a business, trade, or profession" which "carr[y their] own risk (whether by a failure to obtain insurance or otherwise)," and so "are deemed to have a self-insured plan" under the express terms of the MSP statute.

38.    In addition, there is significant other evidence that the defendants are self-insured plans by virtue of their *ex ante*, deliberate choice to carry the risk of liability for tobacco-related illnesses, including the following:

(a)    By the early 1950s, scientific researchers were publishing findings that indicated a relationship between cigarette smoking and various illnesses, including lung cancer. As early as 1954, this growing scientific knowledge triggered litigation brought to hold the defendants liable for tobacco-related illnesses. Since that time, the pace of litigation has increased, while regulatory and legislative bodies have taken a variety of actions addressing tobacco-related

illnesses.  For example, in 1964, the Surgeon General of the United States declared cigarettes to be a health hazard.

(b)     The executives of the defendants, and others in their employ, were, and continue to be, fully aware of the significant risk that the defendants would be held legally liable for the injury or illness caused by their cigarettes.

(c)     The executives of the defendants had and continue to have fiduciary duties to the shareholders of the defendant corporations to make prudent arrangements to protect their corporations from the legal liability to which their cigarettes expose them.  Such arrangements could include the purchase of insurance to cover, at least in part, the liability they might face.  However, the risks involved have made many insurers reluctant to write liability insurance for defendants, and, where they did so, often insurers required a high deductible and a cap on the overall amount insured.

(d)     Knowing the risks of legal liability that their cigarettes generated, the defendants made business decisions to continue to produce and market cigarettes, while vigorously contesting every case brought against them seeking to impose legal liability for tobacco-related illnesses.

(e)     Accordingly, the defendants have deliberately chosen and planned to self-insure for risks of product liability and other tort claims inherent in their business, that is, they have planned to pay such claims from self-insured funds or retained earnings.

(f)     The defendants have admitted that they have specifically planned *ex ante* to self-insure.  Thus, for example, in a June 17, 1963 letter, William R. Lybrook of R.J. Reynolds responded to the inquiry of a current or prospective Reynolds shareholder as follows:

This is to acknowledge your recent letter in which you inquired as to whether this Company has products liability insurance.

We have never carried such insurance but have chosen to be self-insurers in this field.

(g)    Some time after the 1963 letter quoted above, defendant R.J. Reynolds apparently did carry products liability insurance, and then chose to again become self-insured. As the company itself explained in its May 30, 1991 10-K:

RJRN previously had maintained product liability insurance covering certain of these tobacco-related legal actions, proceedings and claims. As of April 13, 1990, RJRN became wholly self-insured for existing tobacco-related litigation risks.

(h)    In 1999, Seth Moscowitz, a representative of R.J. Reynolds, "asserted that R.J. Reynolds Tobacco was self-insured" and explained that "product hazard exclusions" and "health hazard exclusions" have existed in their outside insurance policies for decades. Dan Lonkevich, *Fed's Tobacco Suit Might Prompt Ins. Claims*, NATIONAL UNDERWRITER, PROPERTY & CASUALTY/RISK & BENEFITS MANAGEMENT 42 (September 27, 1999).

(i)    Similarly, "A spokesman told [World Insurance Report] that Brown & Williamson's product liability insurance exclusion *and consequent self-insurance arrangement* extends to legal costs." *Kicking Butts*, WORLD INSURANCE REPORT (April 4, 1997). A spokesman for Brown & Williamson's parent BAT had earlier told the same publication that "like most tobacco companies, BAT's tobacco product liability is entirely self-insured." *Tobacco Makers Concede Over Litigation*, WORLD INSURANCE REPORT (February 21, 1997).

(j)    The defendants have routinely admitted in reports filed with the federal government that they planned to rely on their own cash flows or retained earnings to fund their obligations in the event of liability. For instance, Philip Morris has stated: "It is possible that

the Company's results of operations or cash flows could be materially affected by an ultimate unfavorable outcome of certain pending litigation. Management believes, however, that the ultimate outcome of all pending litigation should not have a material adverse effect on the Company's financial position." Philip Morris, Inc., 10-K, at 23 (Dec. 31, 1996).

(k)    The Liggett Group Inc. has similarly stated, "it is possible that Liggett's financial position, results of operations and cash flows could be materially adversely affected by an ultimate unfavorable outcome in any of such pending litigation." Liggett Group Inc., 10-K, at 19 (Dec. 31, 1996).

(l)    As far back as 1986 it was reported that tobacco "industry sources say the companies are now self-insuring," as "the cost of liability insurance has 'gone through the roof,' according to one tobacco marketer." Nancy Giges, *Marketers Feel Product Liability Pressure; Risks Crimp Launch of New Items*, ADVERTISING AGE (May 12, 1986).

(m)    Over a dozen years ago it had already become well-known in the insurance industry that "[p]roduct liability insurance covering health risk has been largely unavailable to most cigarette makers for roughly a decade, and several large companies now self-insure their product exposures." Douglas McLeod, *Tobacco Award Raises Insurance Questions*, BUSINESS INSURANCE (June 20, 1988).

(n)    The prevailing practice in the tobacco industry to have self-insurance plans for liability coverage is evident from the statements of other entities involved in the cigarette business. For example, Core Mark International, Inc. is a distributor of various consumer goods, including cigarettes. As it pointed out in a prospectus filed with the SEC, it "is particularly dependent on the leading producers of cigarettes," which, as of 1997, included

RJR, Philip Morris, and Brown & Williamson.  Core Mark International, Inc., Prospectus

Filed Pursuant to Rule 424 (B)(1), at 16 (filed Jan. 10, 1997).  In its Prospectus, Core Mark

went on to explain:

> In light of the claimed health risks related to the use of cigarettes and
> other tobacco products, there can be no assurance that product liability claims
> will not be asserted against the tobacco industry or the Company in the future.
> Such lawsuits, if asserted against the tobacco industry or the Company and
> adversely determined, could have a material adverse effect on the Company's
> business and financial position.  The Company carries general liability
> insurance, but *self-insures against liability in respect of health-related claims,*
> *which management believes is consistent with industry practice.*

*Id.* at 18 (emphasis added).

(o)    The defendants' choice to pay liability claims from their cash flows or retained

earnings, that is, to carry their own risk of legal liability for tobacco-related illnesses rather

than taking out insurance with a carrier, relies in part on behavior patterns of consumers that

indicate that increases in the price of cigarettes will not significantly decrease the volume of

purchases of these products (in economics parlance, price-inelasticity), evidencing a peculiarly

stable demand due to the addiction of customers and the effectiveness of massive advertising;

and on a sophisticated body of knowledge that has been developed to estimate the liability risks

they carry.

(p)    Defendant Philip Morris illustrated how this mechanism works in practice in its

1998 10-K, in which it detailed that "[o]perating companies income for 1998 decreased . . .

due primarily to higher tobacco-related settlement charges ($1.9 billion) . . . partially offset by

price increases, net of cost increases ($1.8 billion)."  Philip Morris, Inc., 10-K, at 27 (March

18, 1999).

39.   As entities that engage in a business, trade, or profession, the defendants have self-insured plans and are primary plans within the meaning of the MSP statute if they simply have failed to obtain insurance for their tort liabilities, for whatever reasons or even lack of reasons.  However, the defendants surpass that basic statutory threshold because they have adopted deliberate, *ex ante* plans to carry their own risk of tort liability, and so have adopted plans of self-insurance and are primary plans within the meaning of the MSP statute.

### C. The Defendants Are Liable in Tort for the Tobacco-Related Illnesses of Medicare Beneficiaries.

#### 1. Defendants Concealed, Denied, and Manipulated the Addictive Properties of Their Cigarettes.

40.   In the latter half of the twentieth century, some 10 million Americans were killed by tobacco-related illnesses.  In 2001, and every year into the foreseeable future, nearly one-half million Americans have died, or are expected to die, prematurely due to disease caused by cigarette smoking.

41.   Tobacco-related illnesses include leukemia, emphysema, COPD, and cancers of the lung, larynx, oral cavity, esophagus, pancreas, bladder, kidney, stomach, and cervix.

42.   At least 90 percent of cases of lung cancer in men are attributable to smoking.

43.   At least 79 percent of cases of lung cancer in women are attributable to smoking.

44.   At least 81 percent of cases of cancer of the larynx in men are attributable to smoking.

45.   At least 87 percent of cases of cancer of the larynx in women is attributable to smoking.

19

46.    At least 92 percent of cases of cancer of the oral cavity in men is attributable to smoking.

47.    At least 61 percent of cases of cancer of the oral cavity in women is attributable to smoking.

48.    At least 78 percent of cases of cancer of the esophagus in men is attributable to smoking.

49.    At least 75 percent of cases of cancer of the esophagus in women is attributable to smoking.

50.    At least 29 percent of cases of cancer of the pancreas in men is attributable to smoking.

51.    At least 34 percent of cases of cancer of the pancreas in women is attributable to smoking.

52.    At least 47 percent of cases of cancer of the bladder in men is attributable to smoking.

53.    At least 37 percent of cases of cancer of the bladder in women is attributable to smoking.

54.    At least 48 percent of cases of cancer of the kidney in men is attributable to smoking.

55.    At least 12 percent of cases of cancer of the kidney in women is attributable to smoking.

56.    At least 17 percent of cases of cancer of the stomach in men is attributable to smoking.

57.    At least 25 percent of cases of cancer of the stomach in women is attributable to smoking.

58.    At least 20 percent of cases of leukemia in men is attributable to smoking.

59.    At least 20 percent of cases of leukemia in women is attributable to smoking.

60.    At least 31 percent of cases of cancer of the cervix is attributable to smoking.

61.    At least 80 to 90 percent of emphysema is attributable to smoking.

62.    At least 80 to 85 percent of COPD is attributable to smoking.

63.    Cigarettes contain nicotine, which, among other effects, activates areas of the brain that are involved in producing feelings of pleasure and reward. At the same time, nicotine causes physical dependence and a withdrawal syndrome after abstinence from it. Nicotine thus is an addictive drug. The addictive nature of nicotine is directly related to the harm caused by cigarettes, because the health risks of smoking increase with prolonged use. The primary factor that prevents cigarette smokers from quitting smoking is their addiction to nicotine and their need for continuing intake of nicotine to avoid nicotine withdrawal.

64.    The defendants and their agents have long known that nicotine is a powerful pharmacological agent – that is, a drug – with significant psychoactive effects. Most importantly for purposes of this action, defendants have long recognized that nicotine is addictive, and that addiction is what preserves the market for cigarettes and ensures their profits.

65.    In contrast, the public at large has not been aware of the addictive properties of nicotine, and have believed that smoking and – most importantly for the health consequences of smoking -- *continuing* to smoke are largely matters of choice for which the individual is responsible. Most beginning smokers – particularly youngsters – falsely believe that they will

21

be able to quit after smoking for a few years and thereby avoid the illnesses caused by smoking.

66.    The defendants not only have been fully aware of this popular misconception of the addictive properties of nicotine; they have sought to perpetuate it by concealing the facts concerning nicotine's addictiveness. Indeed, the defendants have deliberately understood and manipulated the addictive properties of nicotine in their cigarettes to undermine the ability of consumers to freely choose to refrain from smoking. The defendants have consciously pursued a clandestine business strategy that relies on creating and maintaining a market of captive consumers by virtue of the defendants' control over, and manipulation of, the nicotine in their cigarettes.

67.    The defendants have understood nicotine's addictive properties since at least the early 1960s. More than 30 years ago, a report was completed for one of the defendants that specifically addressed the mechanism of nicotine addiction in smokers. The researchers concluded that chronic intake of nicotine, such as that which occurs in regular cigarette smokers, creates a need for ever-increasing levels of nicotine to maintain the desired action: "[u]nlike other dopings, such as morphine, the rate of increasing demand for greater dose levels is relatively slow for nicotine." The report continues:

>    A body left in this unbalanced state craves for renewed drug intake in order to restore the physiological equilibrium. This unconscious desire explains the addiction of the individual to nicotine.

68.    Forty three years ago, in 1959, the research department of Philip Morris stated the fact of the matter quite baldly: "Why do people smoke? . . . Addiction."

69.    Lorillard similarly noted: "The consensus of opinion derived from a review of the literature on the subject indicates the most probable reason for the addictive properties of the smoke is nicotine."

70.    In 1962, Sir Charles Ellis, a scientific advisor to the board of directors of BAT Industries, asserted in a meeting attended by Brown & Williamson representatives, that "smoking is a habit of addiction." Similarly, a year later Brown & Williamson general counsel Addison Yeaman pointed out that "nicotine is addictive," and concluded, logically, "We are, then, in the business of selling nicotine, an addictive drug." In the early 1980s researchers at Brown & Williamson echoed the point: "Nicotine is the addicting agent in cigarettes."

71.    Similarly, Reynolds, understanding the importance of retaining sufficient nicotine to maintain dependence on its so-called "low tar/low nicotine" cigarettes, internally proposed in 1971 that the company undertake research into determining more exactly the "habituating level of nicotine." Developing their understanding of these attributes of nicotine became a key effort for the defendants, as was reflected in a 1980 memorandum from a Philip Morris official:

> *Nicotine is a powerful pharmacological agent* with multiple sites of action *and may be the most important component of cigarette smoke. Nicotine and an understanding of its properties are important to the continued well being of our cigarette business* since this alkaloid has been cited often as the reason for smoking and theories have been advanced for nicotine titration by the smoker. Nicotine is known to have effects on the central and peripheral nervous system as well as influencing memory, learning, pain perception, response to stress and level of arousal.

(Emphasis added.)

23

72.     Much of the defendants' inquiries into the attributes of nicotine reflected an appreciation of the role of nicotine in creating new consumers of the defendants' cigarettes. For example, in 1974, Philip Morris researchers began a study designed to test their theory that hyperkinetic children take up smoking in adolescence because nicotine may perform the same pharmacological function as prescription medications used to treat hyperkinesis:

> It has been found that amphetamines, which are strong stimulants, have the anomalous effect of quieting these children down . . . Many children are therefore regularly administered amphetamines throughout grade school years. . . . *We wonder whether such children may not eventually become cigarette smokers in their teenage years as they discover the advantage of self-stimulation via nicotine.* We have already collaborated with a local school system in identifying some such children in the third grade.

(Emphasis added.)

73.     The commercial value of the addictive attributes of nicotine – that is, the properties of their cigarettes that help to create a captive market – were not lost on the defendants. For example, a 1971 secret internal report distributed to Philip Morris executives showed that tobacco executives knew the powerfully addictive nature of nicotine in cigarettes. The report studied persons who had tried to stop smoking and concluded that only 28 percent of those who tried to quit were still non-smokers eight months later:

> Even after eight months quitters were apt to report having neurotic symptoms, such as feeling depressed, being restless and tense, being ill-tempered, having a loss of energy, being apt to doze off. They were further troubled by constipation and weight gains which averaged about five pounds per quitter . . . This is not the happy picture painted by the Cancer Society's anti-smoking commercial which shows an exuberant couple leaping into the air and kicking their heels with joy because they've kicked the habit. A more appropriate commercial would show a restless, nervous, constipated husband bickering viciously with his bitchy wife who is nagging him about his slothful behavior and growing waistline.

24

74.     As one presenter at a tobacco company conference summed up the results of
studies of smokers who attempted to quit: "Although intentions and attempts to quit are
relatively high (30-40% of smokers [in a given year]), the actual success rate of quitting is
relatively low and stable."

75.     Notwithstanding the facts concerning the addictiveness of nicotine established by
the defendants' own studies, the defendants concealed their research and continued to deny the
addictiveness of nicotine.

76.     For example, a 1977 Philip Morris study on the withdrawal effects of nicotine
was permitted to proceed only if the results were favorable.  If not, as a Philip Morris
researcher explained, "we will bury it."

77.     For example, an internal 1978 Brown & Williamson memorandum discussed the
addictiveness of nicotine and characterized nicotine as a poison, while noting that most
consumers were unaware of this:  "Very few consumers are aware of the effects of nicotine,
i.e., its addictive nature and that nicotine is a poison. . . . [H]ardly any consumers use nicotine
numbers as a basis for their purchase."

78.     For example, in March 1980, a Philip Morris scientist produced an internal
memorandum discussing company research into the pharmacology of nicotine.  The research
was "aimed at understanding that specific action of nicotine which causes the smoker to
repeatedly introduce nicotine into his body."  The internal memorandum noted that it was "a
highly vexatious topic" that company lawyers did not want to become public because nicotine's
drug properties, if known, would support regulation of tobacco by the federal Food and Drug
Administration.  Consequently, the memorandum observed, "[o]ur attorneys . . . will likely
continue to insist on a clandestine effort in order to keep nicotine the drug in low profile."

79.   For example, in the early 1980s, Philip Morris hired Victor DeNoble and Paul Mele to study the effects of nicotine on the behavior of rats and to research and test potential nicotine analogues.  DeNoble and Mele's research demonstrated that nicotine was addictive and that, in terms of addictiveness, "nicotine looked like heroin."  In August 1983, Philip Morris ordered DeNoble to withdraw a research paper on nicotine that had already been accepted for publication after full peer review by the respected journal, PSYCHOPHARMACOLOGY.  Less than a year later, Philip Morris abruptly closed DeNoble's research lab.  Philip Morris executives threatened DeNoble and Mele with legal action if they published or talked about their nicotine research.  Their research animals were killed, the equipment was removed, and all traces of the former lab were eliminated.

80.   For example, in 1988, when the Surgeon General concluded, based on non-industry research, that nicotine is addictive, agents of the defendants disputed that conclusion, saying that "claims that cigarettes are addictive contradict common sense. . . . The claim that cigarette smoking causes physical dependence is simply an unproven attempt to find some way to differentiate smoking from other behaviors."

81.   For example, in a 1992 pamphlet, Philip Morris claimed, "Those who term smoking an addiction do so for ideological – not scientific – reasons."

82.   As late as 1994, in an appearance before Congress, the chief executive officers of the defendant corporations were asked by Rep. Ron Wyden: "Do you believe nicotine is not addictive?"  Under oath, they replied:

William Campbell (Philip Morris):  "I believe that nicotine is not addictive, yes."

26

James Johnston (Reynolds): "Congressman, cigarettes and nicotine clearly do not meet the classic definition of addiction."

Andrew Tisch (Lorillard): "I believe that nicotine is not addictive."

Edward Horrigan (Liggett): "I believe that nicotine is not addictive."

Thomas Sandefur (Brown & Williamson): "I believe that nicotine is not addictive."

Donald Johnson (American Tobacco): "And I, too, believe that nicotine is not addictive."

83.    At the same time that they were denying the addictiveness of nicotine, the defendants not only knowingly continued to produce and market cigarettes with the addicting properties of nicotine, but they were developing and using highly sophisticated technologies designed to deliver nicotine to smokers in ways intended to create and sustain addiction in the vast majority of individuals who smoke regularly. This manipulation of the nicotine content of cigarettes is achieved through selective breeding and cultivation of plants for nicotine content, and careful tobacco leaf purchasing and blending plans. The manipulation of nicotine delivery (that is, the amount of nicotine absorbed by the smoker) is achieved by various design and manufacturing techniques. As a 1973 internal Reynolds document explained:

Methods which may be used to increase smoke pH and/or nicotine "kick" include: (1) increasing the amount of (strong) burley in the blend, (2) reduction of casing sugar used on the burley and/or blend, (3) use of alkaline additives, usually ammonia compounds, to the blend, (4) addition of nicotine to the blend, (5) removal of acids from the blend, (6) special filter systems to remove acids from or add alkaline materials to the smoke, and (7) use of high air dilution filter systems. Methods 1-3, in combination, represent the Philip Morris approach, and are under investigation [by Reynolds].

84.    Common among the chemical manipulations of tobacco to enhance the effect of nicotine is the use of ammonia. As a handbook from Brown & Williamson explains:

Ammonia, when added to a tobacco blend, reacts with the indigenous nicotine salts and liberates free nicotine. As a result of such change, the ratio of extractable nicotine to bound nicotine in the smoke may be altered in favor of extractable nicotine. As we know, extractable nicotine contributes to impact in cigarette smoke and this is how ammonia can act as an impact booster.

85.    Thus the denial and concealment of the addictiveness of nicotine is a central element of this case, at the core of defendants' tortious conduct. As a 1980 memorandum from the industry's Tobacco Institute conceded, "We can't defend continued smoking as 'free choice' if the person was addicted."

86.    However, at least one defendant, Philip Morris, has now abandoned that strategy of denial and concealment of which it was a part for so many decades, coinciding with its support for legislation, now pending in Congress, that would provide for FDA regulatory authority over tobacco products. While Philip Morris states that such regulation would provide for "greater consistency in tobacco policy," and "more predictability for the tobacco industry," other observers conclude that "selling cigarettes under government supervision would improve its public relations and legal atmosphere and would enable it to roll out 'reduced risk' cigarettes with the apparent approval of government scientists."

87.    On its website, Philip Morris now says, "We agree with the overwhelming medical and scientific consensus that cigarette smoking is addictive."

88.    No longer does Philip Morris dismiss the Surgeon General's warnings about the health effects and addictiveness of cigarette smoking as ideologically motivated, but describes the Surgeon General as "the nation's leading spokesperson on matters of public health," and the Philip Morris website provides a direct link to the very Surgeon General Report on nicotine addictiveness it sought to discredit.

89.    The Philip Morris website also provides a direct link to the Centers for Disease Control ("CDC") website, which emphasizes, "[N]icotine is a very addictive drug. For some people, it can be as addictive as heroin or cocaine."

90.    Philip Morris now "agree[s] with the overwhelming medical and scientific consensus that cigarette smoking causes lung cancer, heart disease, emphysema and other serious diseases in smokers."

## 2. DEFENDANTS' CONDUCT CONSTITUTES A BATTERY

91.    The risk of a cigarette smoker contracting a tobacco-related illness greatly increases with prolonged use of cigarettes.

92.    Smoking cigarettes is addictive.

93.    The addictive properties of cigarettes cause or significantly contribute to the prolonged use of cigarettes.

94.    The addictive properties of smoking cigarettes are caused by the nicotine in or added to the tobacco.

95.    The addictive properties of the defendants' cigarettes pose a hazard distinct from the direct physical dangers of smoking.

96.    At all relevant times, the defendants were aware of the addictive quality of the nicotine in their cigarettes.

97.    At all relevant times, the defendants attempted to manipulate the levels of nicotine in their cigarettes to maintain or increase the addictive properties of their cigarettes.

98.    At all relevant times, the defendants denied and attempted to conceal the addictive properties of the nicotine in their cigarettes.

99.    The exposure of a person to the addictive properties of nicotine in the defendants' cigarettes constitutes a harmful or offensive contact with that person.

100.    The defendants intended to cause the exposure of the persons who became Medicare beneficiaries to the addictive properties of nicotine in the defendants' cigarettes, that is, the defendants intended to cause this harmful or offensive contact with those persons.

101.    This harmful or offensive contact with persons who became Medicare beneficiaries, that is, the exposure of the persons who became Medicare beneficiaries to the addictive properties of nicotine in the defendants' cigarettes, directly or indirectly resulted from the acts of the defendants.

102.    The persons who became Medicare beneficiaries did not consent to this harmful or offensive contact, that is, they did not consent to exposure to the addictive properties of nicotine in the defendants' cigarettes.

103.    This harmful or offensive contact constitutes a battery.

104.    As a result of this battery, these persons who became Medicare beneficiaries contracted certain tobacco-related illnesses.

105.    The defendants are liable for the medical expenses incurred to treat the tobacco-related illnesses of these persons who are the victims of the defendants' battery.

106.    From the time the victims of the defendants' battery became Medicare beneficiaries, Medicare paid for the medical expenses necessitated by their tobacco-related illnesses.

## CAUSE OF ACTION

107.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 106, as though fully set forth herein.

108.    As a result of their battery, each defendant was and is an entity which has or had a responsibility to pay for the costs of the tobacco-related health care services of Medicare beneficiaries, within the meaning of the MSP statute.

109.    Under the terms of the MSP statute, each defendant was and is, with respect to the costs of the tobacco-related health care services of Medicare beneficiaries, a primary plan and so required to be the payer primary for those costs, while Medicare was to be only the secondary payer.

110.    None of the defendants paid for, or in any other way provided for primary payment of, these costs of the tobacco-related health care services of Medicare beneficiaries, in violation of the MSP statute.

111.    Due to this wrongful conduct of the defendants, Medicare became and continues to be the primary payer for these costs of the tobacco-related health care services of Medicare beneficiaries, in violation of the MSP statute.

112.    Under the terms of the MSP statute, Medicare's payments for these costs of the tobacco-related health care services of Medicare beneficiaries were conditioned on reimbursement from the correct primary payer, which each defendant is.

113.    As a result, under the MSP statute, the plaintiffs, or, alternatively the plaintiff Class, is entitled to an award of damages from the defendants in an amount twice that of Medicare's payments for the costs of the tobacco-related health care services of Medicare beneficiaries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs or, alternatively, the plaintiff Class, respectfully prays that the Court enter judgment against the defendants, and each of them, jointly and severally:

31

a.    awarding the plaintiffs, or, alternatively, the plaintiff Class, damages in an amount double the amount paid by Medicare to reimburse health care providers for tobacco-related health care services provided to Medicare beneficiaries, for which treatment the defendants were "required or responsible . . . to make payment" under the Medicare as Secondary Payer Act;

b.    awarding the plaintiffs, or, alternatively the plaintiffs Class, attorneys' fees and their costs of this litigation, including interest; and

c.    granting such other and further relief, including punitive damages, as the Court may deem just and proper.

Respectfully submitted,

s/Mark Miller
Bar Number 0935883
Ford, Miller & Wainer, P.A.
1200 Riverplace Blvd., Suite 600
Jacksonville, FL 32207
Telephone: (904) 390-1970
Fax: (904) 390-1975
E-mail: miller@fordmiller.com

Daniel M. Cohen
  Trial Counsel
Bar Number 0797472
Jonathan W. Cuneo
Cuneo Waldman & Gilbert, LLP
317 Massachusetts Avenue, N.E., Suite 300
Washington, D.C. 20002
Telephone: (202) 789-3960
Fax: (202) 789-1813

Robert J. Cynkar
  Trial Counsel
Joseph R. Egan

Charles J. Fitzpatrick
Egan, Fitzpatrick, Malsch & Cynkar, PLLC
7918 Jones Branch Drive, Suite 200
McLean, VA 22102
Telephone: (703) 918-4946
Fax: (703) 918-4943

Mark B. Hutton
  Trial Counsel
Derek S. Casey
Chan P. Townsley
Hutton & Hutton Law Firm, L.L.C.
P.O. Box 638
Wichita, KS 67201-0638
Telephone: (316) 688-1166
Fax: (316) 686-1077

Gary L. Richardson
  Trial Counsel
Fred Stoops
Charles L. Richardson
Richardson, Stoops, Richardson & Ward
The Richardson Building
6555 S. Lewis Avenue
Tulsa, OK 74136
Telephone: (918) 492-7674
Facsimile: (918) 493-1925

Attorneys for Plaintiffs