**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

GENEVA GLOVER and JAMES GILLINS,
as private attorneys general,

        Plaintiffs,

vs.                            Case No. 3:04-cv-403-J-32MMH

PHILIP MORRIS USA, and
LIGGETT GROUP, INC.,

        Defendants.

_____

## ORDER

      This case is before the Court on Defendants' Motion to Dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(6), (Doc. 57), and plaintiffs' response (Doc.

66).  The Honorable Charles E. Grassley, United States Senator, filed an <u>amicus</u>

<u>curiae</u> memorandum in opposition to defendants' motion.  (Doc. 72).  Defendants,

with leave of the Court, filed a reply.  (Doc. 77).  The Court heard oral argument on

defendants' motion, the proceedings of which are hereby incorporated by

reference.  (Doc. 89).

### I.  Motion to Dismiss Standard

      When considering a motion to dismiss under Rule 12(b)(6) a court must

accept the allegations of the plaintiff's complaint as true and construe the

allegations in the light most favorable to the plaintiff.  <u>Hill v. White</u>, 321 F.3d 1334,

1335 (11th Cir. 2003).  A complaint may not be dismissed under Rule 12(b)(6)

"unless it appears beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief."  Lopez v. First Union Nat'l

Bank, 129 F.3d 1186, 1189 (11th Cir. 1997) (quoting Conley v. Gibson, 355 U.S.

41, 45-46 (1957)).  Rule 12(b)(6) authorizes a court to dismiss a complaint on a

dispositive issue of law.  Marshall County Bd. of Educ. v. Marshall County Gas

Dist., 992 F.2d 1171, 1174 (11th Cir. 1993).

## II.  Background

The Medicare Secondary Payer statute ("MSP"), which was enacted to

reduce federal health care costs, "makes Medicare the secondary payer for

medical services provided to Medicare beneficiaries whenever payment is

available from another primary payer."  Cochran v. United States Health Care Fin.

Admin., 291 F.3d 775, 777 (11th Cir. 2002).  "This means that if payment for

covered services has been or is reasonably expected to be made by someone

else, Medicare does not have to pay."  Id.  "Consequently, Medicare is empowered

to recoup from the rightful primary payer (or from the recipient of such payment) if

Medicare pays for a service that was, or should have been, covered by the primary

insurer."  United States v. Baxter Int'l, Inc., 345 F.3d 866, 875 (11th Cir. 2003).

The MSP also contains a private cause of action which gives private citizens an

incentive to aid the government in recovering "funds erroneously paid by

Medicare."  Manning v. Utilities Mut. Ins. Co., 254 F.3d 387, 397 n.8 (2d Cir. 2001).

The Eleventh Circuit has noted that while the "MSP's function is straightforward,"

the "statute is structurally complex – a complexity that has produced considerable

confusion among courts attempting to construe it."  Baxter, 345 F.3d at 875.

Plaintiffs Geneva Glover and James Gillins filed this action as private

attorneys general under the MSP to recover expenditures Medicare made in

Florida after May 26, 1998, for the treatment of diseases attributable to cigarette

smoking.  (Doc. 42, ¶ 1).  According to the First Amended Complaint, defendants

Philip Morris USA and Liggett Group, Inc. have long known that the nicotine in

cigarettes is addictive.  (Id., ¶ 62).  Defendants, however, allegedly denied and

attempted to conceal the addictive nature of their cigarettes.  (Id., ¶ 64).  The

addictiveness of cigarettes, plaintiffs allege, causes their prolonged use which in

turn increases the risk of a smoker contracting a disease attributable to smoking.

(Id., ¶¶ 57, 59).  Thus, plaintiffs contend that exposing persons to the nicotine in

cigarettes is a harmful or offensive contact with those persons constituting a

common law battery by defendants.  (Id., ¶¶ 57-69).  Plaintiffs claim that, as a

result of this battery, defendants are liable for the victims' medical expenses

attributable to cigarette smoking.  (Id., ¶ 71).  Some of these victims became

Medicare beneficiaries and Medicare has paid for their smoking related medical

expenses.  (Id., ¶ 72).

3

Based on these allegations, plaintiffs bring a cause of action under the MSP. (Id., ¶ 74).  Plaintiffs allege that defendants, as a result of their battery, have the responsibility to reimburse Medicare for the medical costs of Medicare beneficiaries' smoking related diseases.  (Id.).  Neither defendant has paid such costs, (Id., ¶ 76), while Medicare continues to pay medical expenses for diseases associated with the smoking of defendants' cigarettes.  (Id., ¶ 77). Plaintiffs allege that, under the MSP's private cause of action, they are entitled to sue as private attorneys general for damages totaling double the amount Medicare has paid in medical expenses for its Florida beneficiaries' diseases attributable to smoking cigarettes.  (Id., ¶ 79).  Plaintiffs' First Amended Complaint limits their claim to post May 26, 1998, medical expenses paid by Medicare on behalf of its Florida beneficiaries.  (Id., ¶ 1).  Even with these limitations, at oral argument, plaintiffs estimated their damages claim to be in the billions of dollars.

Defendants have now moved to dismiss plaintiffs' First Amended Complaint. (Doc. 57).  Defendants argue that plaintiffs' claims are barred by collateral estoppel, are duplicative of those brought by the United States in a different forum, and fail to state a claim because the MSP does not provide a private cause of action against an alleged tortfeasor, meaning a defendant accused of a tort that has not yet been found liable, against which no judgment has been entered and as to which no settlement or compromise has been reached.  (Id.).

4

### III.  Discussion

### A.  Collateral Estoppel

Defendants argue that the Court should dismiss the First Amended Complaint because plaintiffs are collaterally estopped from arguing that defendants are "required or responsible" to reimburse Medicare under the MSP.  (Doc. 58 at 15).  That issue, according to defendants, has been fully litigated by the government in federal court in the District of Columbia and by private attorney general plaintiffs in federal court in New York.  (Id. at 15-20).  Plaintiffs respond that collateral estoppel is inapplicable here because there has been an intervening change in the MSP, plaintiffs are not in privity with the plaintiffs in the other lawsuits, and the public interest mandates that the prior adjudications not be given conclusive effect.  (Doc. 66 at 17-18).

### 1.  The Lawsuit Brought by the United States

Defendants first argue that plaintiffs' claims are collaterally estopped based upon the claims brought by the United States in the District of Columbia.  See United States v. Philip Morris Inc., 116 F. Supp. 2d 131 (D.D.C. 2000) (Philip Morris I); United States v. Philip Morris Inc., 156 F. Supp. 2d 1 (D.D.C. 2001) (Philip Morris II).  In Philip Morris I and Philip Morris II, the United States sued eleven tobacco entities (including defendants in this case) to recover health care expenditures for tobacco-related illnesses.  Philip Morris I, 116 F. Supp. 2d at 134.

5

The government's claims were based on three statutes: the MSP, the Medical Care Recovery Act ("MCRA"), and the Racketeer Influenced and Corrupt Organizations Act ("RICO").  The government's theory under the MSP was that the defendants were "primary plans" as defined by the MSP because they "themselves assumed the liability stemming from tobacco-related tort suits and, therefore, as 'self-insured' entities, [could] be sued under MSP."  Id. at 145.  The Philip Morris I court dismissed the government's MSP count because it lacked "any allegation that [the companies] have established a 'plan' or 'arrangement' under which they would be considered self-insured entities subject to MSP's reach."  Id. at 146.

The government subsequently amended its MSP claim, Philip Morris II, 156 F. Supp. 2d at 2, alleging that the companies "recognized the risks associated with their manufacture, sale, and promotion of tobacco products, considered the possibility of insuring against such risks through contract, agreement, or arrangement with one another, and/or, third party insurers, and made the business decision to obtain partial third party insurance and/or to self-insure, in whole or in part, against those risks."  Id. at 4-5.  However, the court again granted defendants' motion to dismiss, reasoning that the amended complaint failed to allege the requirements of a "self-insured plan" as used in the MSP, including "the existence of reserves or procedures for establishing and calculating them; of claims-handling procedures; of a fiduciary (or other independent body) to perform

6

these tasks; or written documents allocating legal responsibilities and obligations."

Id. at 6.

Defendants argue that the holdings in Philip Morris I and Philip Morris II that

they were not "required or responsible" under the MSP to reimburse Medicare

precludes that issue from being revisited here.  According to defendants, plaintiffs,

as private attorneys general, are in privity with the federal government, and the

dismissal of the government's MSP claim is final.  Plaintiffs respond that the MSP

has been amended since Philip Morris I and Philip Morris II.

At the time Philip Morris I and Philip Morris II were decided, the MSP defined

the term "primary plan" in relevant part as "a workmen's compensation law or plan,

an automobile or liability insurance policy or plan (including a self-insured plan) or

no fault insurance."  42 U.S.C. § 1395y(b)(2)(A)(ii) (2001).  The statute did not

define "self-insured plan," see id., and courts split over what constituted a self-

insurance plan under the statute.  Some courts, such as the Philip Morris II court,

held that "under MSP a 'primary plan' of 'self-insurance' requires an entity's ex

ante adoption, for itself, of an arrangement for (1) a source of funds and (2)

procedures for disbursing these funds when claims are made against the entity."

Brown v. Thompson, 374 F.3d 253, 261 (4th Cir. 2004) (quoting Thompson v.

Goetzmann, 337 F.3d 489, 498 (5th Cir. 2003)) (quotations omitted).  Other courts

"found that a self-insured plan merely had to involve some kind of 'ex ante

arrangement,' but need not involve any setting aside of funds or formal procedures." <u>Brown</u>, 374 F.3d at 261 (citing <u>Baxter</u>, 345 F.3d at 896-98).

On December 8, 2003, the President signed the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") which "set forth with more particularity the requirements for a self-insured plan" under the MSP. <u>Brown</u>, 374 F.3d at 261. The MMA added the following sentence to the MSP: "An entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part." Pub. L. No. 108-173, § 301(b)(1), 117 Stat. 2066, 2222 (2003). This clarification in the law, which Congress made retroactive to the Omnibus Reconciliation Act of 1980 (the origin of the MSP), <u>id.</u> at § 301(d)(2), was added to address "[r]ecent court decisions" that allowed "firms that self-insure for product liability . . . to avoid paying Medicare for past medical payments related to the claim." H.R. Rep. No. 108-178(II), at 189-90 (2003). <u>See also</u> <u>Brown</u>, 374 F.3d at 262 ("With this language . . . Congress has plainly indicated that the term 'self-insured plan' should be given a relatively broad definition, unrestricted by formalistic requirements."). Because the <u>Philip Morris II</u> court relied on a definition of a self-insured plan that Congress has now amended, collateral estoppel based on the <u>Philip Morris II</u> decision would be improper because the doctrine "has no application where there has been an intervening change in legal principles." <u>Brock</u>

8

v. Williams Enters. of Ga., Inc., 832 F.2d 567, 574 (11th Cir. 1987).

Defendants apparently recognize that the MMA altered the law applied by the Philip Morris II court. Unlike the motion to dismiss in Philip Morris II, defendants have not argued that the Court should dismiss this case because they are not self-insured plans under the MSP. Instead, defendants assume, for the purposes of this motion, that they are self-insured plans. (Doc. 58 at 21 n.5). While defendants reserve the right to challenge this assertion in any subsequent proceedings, their failure to simply rely on the same arguments they put forth in Philip Morris II is a telling indication that the MMA changed the law applied in that case. Thus, the court's holdings in Philip Morris I and Philip Morris II regarding the applicability of the MSP to these defendants cannot be given preclusive effect in this case.

In a related argument, defendants contend that the Court should dismiss this action or transfer it to the United States District Court for the District of Columbia because it is duplicative of the government's action in Philip Morris I and Philip Morris II. (Doc. 58 at 11-15). Defendants posit that plaintiffs are in privity with the government, are asserting a claim against defendants under the same statute as the government, and are seeking the same damages (Medicare expenditures for tobacco-related illnesses in Florida) sought by the government (Medicare expenditures for tobacco-related illnesses nationwide, including Florida).

9

Moreover, defendants point out that the government still may choose to appeal the district court's dismissal of its MSP claim following the conclusion of the case. Plaintiffs respond that they are not in privity with the government, that they do not seek the same money sought by the government, and that defendants' argument regarding future government appeals is speculative.

"As between federal district courts, . . . the general principle is to avoid duplicative litigation." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976). "This doctrine rests on considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." I.A. Durbin, Inc. v. Jefferson Nat'l Bank, 793 F.2d 1541, 1551 (11th Cir. 1986) (quoting Colorado River, 424 U.S. at 817) (quotations omitted). Generally, "a suit is duplicative of another suit if the parties, issues and available relief do not significantly differ between the two actions." Id. A district court has "broad discretion in determining whether to stay or dismiss litigation in order to avoid duplicating a proceeding already pending in another federal court." Id. at 1551-52.

While there is the potential for overlap between the government's suit and the case sub judice, the procedural posture of the government's suit counsels against a finding that this litigation is impermissibly duplicative. Though the District Court for the District of Columbia dismissed the government's MSP claim, the

10

government's RICO claim remained.  Indeed, the court recently concluded a

lengthy bench trial on the government's RICO claim and currently has the case

under advisement.  In the meantime, the MSP was amended by the MMA, and it is

uncertain whether the government will appeal the dismissal of its MSP claim.

Thus, plaintiffs' claim under the MSP, as amended by the MMA, is not duplicative

of the government's litigation as it currently stands; therefore, this case is not due

to be dismissed on this ground.

For the same reasons, the Court declines to transfer this action the District

of Columbia pursuant to 28 U.S.C. § 1404(a).  Defendants assert that transfer is

appropriate here because it would avoid duplicative litigation and prevent the

possibility of inconsistent judgments.  As discussed above, defendants' duplicative

litigation argument is not meritorious.  Furthermore, any concern over inconsistent

judgments is alleviated by the intervening amendment to the MSP by the MMA.

The Court therefore exercises its discretion in favor of not transferring the case.

See Brown v. Connecticut Gen. Life Ins. Co., 934 F.2d 1193, 1197 (11th Cir. 1991)

("The decision to transfer a case to another district is left to the sound discretion of

the trial court.").

## 2.  The Lawsuit Brought by Private Attorneys General

Prior to the MMA amendments to the MSP, a group of plaintiffs (represented

by some of the same lawyers representing plaintiffs in this case) brought a

11

proposed class action against several tobacco companies (including the

defendants in this case) under the private cause of action provision of the MSP.

See Mason v. American Tobacco Co., 212 F. Supp. 2d 88, 90 (E.D.N.Y. 2002).

The Mason plaintiffs sought to represent the class of "[i]ndividuals who have

received or are receiving health care services for the treatment of tobacco-related

illnesses, . . . which services have been paid for, or are being paid for, by

Medicare." Id.  The district court granted the defendants' motion to dismiss,

reasoning in part that "[d]efendants' status as accused tortfeasors, standing alone,

does not covert them under the statute into primary plans or self-insured plans for

Medicare beneficiaries injured by using their products." Id. at 92.  The district

court, relying on Philip Morris II, further reasoned that "one requirement for an

entity to be a self-insured plan is the provider must establish a fund with an

independent fiduciary which is documented by a written agreement that includes

legal responsibilities and obligations required by State laws for payment of medical

expenses of those injured by its products." Id. (quotations and citations omitted).

The district court found that the "[d]efendants ha[d] no such plan in place" and that

there was no basis conclude "that the MSP statute was intended to apply to

tortfeasors generally." Id. at 92-93.

    The Second Circuit affirmed.  Mason v. American Tobacco Co., 346 F.3d 36

(2d Cir. 2003).  The court rejected the plaintiffs' argument that the corporate

12

structure through which each of the defendants acted had the purpose of assuming legal liability for injuries and that the corporate form was the means of self-insurance on the part of each company.  Id. at 40.  The court reasoned that "[t]he obvious problem with [that] approach is that it turns every corporation into an insurance company subject to suit under the MSP statute."  Id. (emphasis in original).  The Second Circuit also reasoned that the MSP requires "some type of formal arrangement by which an entity consciously decides to set aside funds to cover potential future liabilities and a formal procedure for processing claims made against that fund pursuant to the terms of the 'plan.'" Id. at 41 (quotations and citation omitted).  Finally, the court determined that there was no "reason as to why the MSP statute should apply to tort litigation."  Id. at 43 (emphasis in original).  The court reasoned that "the defendants are clearly correct when they assert that the trigger for bringing a MSP claim is not the pendency of a disputed tort claim, but the established obligation to pay medical costs pursuant to a pre-existing arrangement to provide insurance benefits."  Id. at 43.

Based on the Second Circuit panel opinion alone, the Court would decline to give Mason preclusive effect for the same reasons expressed as to Philip Morris I and Philip Morris II.  The intervening change in the MSP wrought by the MMA clarifies that "the term 'self-insured plan' should be given a relatively broad definition, unrestricted by formalistic requirements." Brown, 374 F.3d at 262.

13

However, defendants' collateral estoppel argument does not focus on the panel decision in <u>Mason</u>.  Instead, defendants point out that the <u>Mason</u> plaintiffs sent a Federal Rule of Appellate Procedure 28(j) letter to the Second Circuit on November 25, 2003, informing the court that Congress had passed the MMA and urging the panel to withdraw its opinion.  (Doc. 58, Ex. 9).  This letter was sent while the <u>Mason</u> plaintiffs' petitions for rehearing and rehearing <u>en banc</u> were pending.  On December 8, 2003, the same day the President signed the MMA, the Second Circuit summarily denied the petitions for rehearing.  The <u>Mason</u> plaintiffs apparently also sent a letter on that date informing the Second Circuit that the President had signed the MMA.  On January 16, 2004, the Second Circuit issued an unpublished order addressing the November 25, 2003, letter.  (Doc. 65, Ex. B). The Second Circuit wrote:

> Treating the Plaintiffs-Appellants' letters as a motion to recall the mandate, which was issued on December 15, 2003, the motion is DENIED.  As the Defendants-Appellees point out, the new amendments clarify only that an entity "shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance or otherwise)," but do not alter the principle, previously recognized, that "MSP liability attaches only to an entity that is required or responsible to pay under a 'primary plan'" <u>Mason v. American Tobacco Co.</u>, 346 F.3d 36, 42 (2d Cir. 2003), a principle inapplicable to the alleged tortfeasors in this case.

(<u>Id.</u>).  Based on this order, defendants argue that the Second Circuit addressed the MSP as amended.  (Doc. 58 at 20).  Plaintiffs respond that the <u>Mason</u> plaintiffs did

14

not have a full and fair opportunity to litigate the effect of the MMA amendments. (Doc. 66 at 19-20).

In the Eleventh Circuit, "[c]ollateral estoppel is a discretionary doctrine"[1] that "can apply <u>only</u> when the parties are the same (or in privity) and if the party against whom the issue was decided had a full and fair opportunity to litigate the issue in the earlier proceeding." <u>EEOC v. Pemco Aeroplex, Inc.</u>, 383 F.3d 1280, 1285 (11th Cir. 2004) (emphasis in original). "Recognizing that the doctrine places termination of litigation ahead of the correct result, the application of collateral estoppel has been narrowly tailored to ensure that it applies only where the circumstances indicate the issue estopped from further consideration was thoroughly explored in the prior proceeding, and that the resulting judgment thus has some indicia of correctness." <u>Johnson v. Watkins</u>, 101 F.3d 792, 795 (2d Cir. 1996).  "[T]he most significant consideration in determining whether to invoke collateral estoppel is whether the party had a full and fair opportunity to litigate the issue to be estopped." <u>Hercules Carriers, Inc. v. Claimant State of Fla.</u>, 768 F.2d 1558, 1580 (11th Cir. 1985).

_____

[1] <u>Brock</u>, 832 F.2d at 574; <u>see also</u> <u>Dailide v. United States Attorney Gen.</u>, 387 F.3d 1335, 1341 (11th Cir. 2004) (noting that the Eleventh Circuit reviews decisions to apply collateral estoppel for abuse of discretion); <u>United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc.</u>, 755 F. Supp. 1040, 1046 (S.D. Ga. 1990) (collateral estoppel is "a <u>discretionary</u> doctrine" that a court is permitted to use when all of the requisite elements are present) (emphasis in original).

Even assuming that plaintiffs are in privity with the <u>Mason</u> plaintiffs, the

Court declines to apply collateral estoppel because the <u>Mason</u> plaintiffs did not

have a full and fair opportunity to litigate the effect of the MMA amendments before

the Second Circuit.  First, the MMA did not become the law until the President

signed it on December 8, 2003, the same day the Second Circuit denied rehearing.

Second, Federal Rule of Appellate Procedure 28(j) limits a letter citing

supplemental authorities to 350 words.  Finally, the Second Circuit construed the

<u>Mason</u> plaintiffs' letter as a motion to recall the mandate, a remedy an appellate

court exercises only in extraordinary circumstances.  <u>See</u> <u>Calderon v. Thompson</u>,

523 U.S. 538, 550 (1998) ("In light of the profound interest in repose attaching to

the mandate of a court of appeals . . . the power [to recall the mandate] can be

exercised only in extraordinary circumstances.").  While the Second Circuit has

held that "[o]ne circumstance that may justify recall of a mandate is a supervening

change in governing law that calls into serious question the correctness of the

court's judgment," <u>Sargent v. Columbia Forest Prods., Inc.</u>, 75 F.3d 86, 90 (2d Cir.

1996) (citation and quotations omitted), the Court nevertheless concludes that,

under the unique circumstances of the case, giving <u>Mason</u> preclusive effect would

be inappropriate.  Thus, plaintiffs in this case are entitled to proceed.  The Court

will therefore consider defendants' motion to dismiss on the merits.

## B.  Plaintiffs' MSP Claim

Plaintiffs seek to use the private cause of action under the MSP to first establish defendants' state law tort liability and then to seek reimbursement for Medicare payments made on account of that tortious conduct.  Thus, this Court must determine whether Congress has provided a federal private right of action under the MSP, as amended by the MMA, that allows plaintiffs to first try to establish state law tort liability for battery based on defendants' marketing and sale of cigarettes, and then, after defendants' liability has been established, to seek reimbursement for double the amount of the medical costs Medicare paid for smoking related illnesses.

Defendants argue that the MSP only provides a private cause of action to recoup Medicare costs against a tortfeasor after that tortfeasor has already been found liable in a previous action or has settled the claims against it.  Defendants rely on language inserted into the MSP by the 2003 MMA amendments which provides: "A primary plan's responsibility for such payment [reimbursement of Medicare benefits] may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means." Pub. L. No. 108-173, § 301(b)(2), 117 Stat. 2066, 2222 (2003).  Plaintiffs respond

that the "demonstration of a defendant's tort-law 'responsibility' to pay the plaintiffs'
medical costs is a condition precedent to <u>reimbursement</u> of Medicare under the
MSP, but it is not a condition precedent to a determination that the alleged
tortfeasor has a self-insured plan to which the MSP regime is applicable." (Doc. 66
at 12-13). Nothing in the statute, according to plaintiffs, indicates that there is a
"two lawsuit rule" whereby a separate adjudication of defendants' tort liability is
required before an MSP reimbursement action may be brought. (<u>Id.</u> at 13).

### 1. The MSP's Language

"The starting point for all statutory interpretation is the language of the
statute itself." <u>United States v. DBB, Inc.</u>, 180 F.3d 1277, 1281 (11th Cir. 1999).
"The first step is to determine whether the language at issue has a plain and
unambiguous meaning with regard to the particular dispute in the case." <u>Barnhart
v. Sigmon Coal. Co.</u>, 534 U.S. 438, 450 (2002) (quotations and citations omitted).
When considering the statutory language, courts do not "examine statutory
provisions in isolation," but instead read the words of the statute "in their context
and with a view to their place in the overall statutory scheme." <u>Nyaga v. Ashcroft</u>,
323 F.3d 906, 914 (11th Cir. 2003) (citations omitted).

The MSP, as amended by the MMA, provides in relevant part:

> (2) Medicare secondary payer
> (A) In general
> Payment under this subchapter may not be made, except
> as provided in subparagraph (B), with respect to any item

18

or service to the extent that–

(i) payment has been made, or can reasonably be expected to be made, with respect to the item or service as required under paragraph (1), or

(ii) payment has been made or can reasonably be expected to be made under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance.

In this subsection, the term "primary plan" means a group health plan or large group health plan, to the extent that clause (i) applies, and a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance, to the extent that clause (ii) applies.  An entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part.

(B) Repayment required

(i) Authority to make conditional payment
The Secretary may make payment under this subchapter with respect to an item or service if a primary plan described in subparagraph (A)(ii) has not made or cannot reasonably be expected to make payment with respect to such item or service promptly (as determined in accordance with regulations).  Any such payment by the Secretary shall be conditioned on reimbursement to the appropriate Trust Fund in accordance with the succeeding provisions of this subsection.

(ii) Primary plans
<u>A primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service.  A primary plan's responsibility for such payment may be</u>

19

<u>demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means</u>. . . .

(iii) Action by United States
In order to recover payment made under this subchapter for an item or service, the United States may bring an action against any or all entities that are or were required or responsible (directly, as an insurer or self-insurer, as a third-party administrator, as an employer that sponsors or contributes to a group health plan, or large group health plan, or otherwise) to make payment with respect to the same item or service (or any portion thereof) under a primary plan.  The United States may, in accordance with paragraph (3)(A) collect double damages against any such entity.  In addition, the United States may recover under this clause from any entity that has received payment from a primary plan or from the proceeds of a primary plan's payment to any entity. . . .

(3) Enforcement
(A) Private cause of action
There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).

42 U.S.C. § 1395y(b) (emphasis added).

Considering the provisions of the MSP together, there are three elements of the MSP's private cause of action: (1) a primary plan, (2) that is responsible to pay for an item or service, and (3) that failed to make the appropriate payment to

Medicare for the item or service.  Although both plaintiffs and <u>amicus</u> spend most of their briefs attempting to establish that the MMA amendments render defendants "primary plans" under the MSP, defendants concede for the purposes of this motion that they are primary plans.  Instead, defendants focus on the second element and assert that, as a matter of law, plaintiffs cannot allege that defendants are responsible to reimburse Medicare.[2]

Section 1395y(b)(2)(B)(ii), as amended by the MMA, requires a primary plan to reimburse Medicare "if it is demonstrated" that the primary plan "has or had a responsibility" to make payment for an item or service.  Applying this language, it cannot be "demonstrated" that an alleged tortfeasor, which has neither been adjudicated as liable nor has agreed to settle a tort claim, "has" an existing "responsibility" to reimburse Medicare or "had" a previous responsibility to do so.

Additionally, section 1395y(b)(2)(B)(ii) defines how a primary plan's "responsibility" to pay can be "demonstrated" under the MSP.  The language, which was also added by the MMA amendments, provides:  "A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not

_____

[2] Paragraph 74 of plaintiffs' First Amended Complaint alleges:  "As a result of their battery, each defendant was and is an entity which has or had a responsibility to pay for the costs of the health care services provided to Medicare beneficiaries to treat their diseases attributable to smoking the defendants' cigarettes, within the meaning of the MSP statute."  (Doc. 42, ¶ 74).

21

there is a determination or admission of liability) of payment for items or services

included in a claim against the primary plan or the primary plan's insured, or <u>by</u>

<u>other means</u>."  42 U.S.C. § 1395y(b)(2)(B)(ii) (emphasis added).  Defendants

argue that plaintiffs "cannot identify any judgment, settlement, or similar resolution

of their battery claims against defendants."  (Doc. 58 at 22).  While conceding that

their battery claim against defendants has not yet been adjudicated and so far has

not resulted in a judgment or settlement, plaintiffs respond that the "by other

means" language of section 1395y(b)(2)(B)(ii) includes the ability to litigate the

underlying tort claim as part of the MSP private right of action to secure

reimbursement for Medicare payments.

Considered in isolation, the plain meaning of the rather generic phrase "by

other means" might be difficult to determine.  However, read in context and

applying accepted canons of statutory construction, the meaning can be

ascertained.  "If the statutory language is not entirely transparent, [courts] employ

traditional canons of construction before reverting to legislative history to assist

[them] in determining the meaning of a particular statutory provision . . . ."  <u>Schotz</u>

<u>v. City of Plantation</u>, 344 F.3d 1161, 1167 (11th Cir. 2003) (quotations and citation

omitted).  "[U]nder the established interpretative canons of <u>noscitur a sociis</u> and

<u>ejusdem generis</u>, where general words follow specific words in a statutory

enumeration, the general words are construed to embrace only objects similar in

22

nature to those objects enumerated by the preceding specific words." <u>Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler</u>, 537 U.S. 371, 384 (2003) (quoting <u>Circuit City Stores, Inc. v. Adams</u>, 532 U.S. 105, 114-15 (2001)); <u>see also</u> <u>Baxter</u>, 345 F.3d at 906 (utilizing the canon of <u>ejusdem generis</u> to interpret different language in the MSP).

Applying <u>ejusdem generis</u> here, the "by other means" language is preceded by specifically enumerated means by which a primary plan's responsibility to pay may be demonstrated:  a judgment and "a payment conditioned upon the recipient's compromise, waiver, or release . . . of payment for items or services included in a claim against the primary plan . . ." (i.e., a settlement).  In these situations, a primary plan has either been adjudicated as required to pay for medical services as to which Medicare is a secondary payer or has agreed to do so as part of a settlement.  In either case, the obligation of the primary plan to make the payment has already been established.  The "by other means" language in section 1395y(b)(2)(B)(ii) encompasses other instances of "like kind"[3] where there is a previously established requirement or agreement to pay for medical services for which Medicare is entitled to be reimbursed, which instances Congress chose not to try to exhaustively enumerate.  The "by other means" language of section 1395y(b)(2)(B)(ii) does not encompass the unresolved,

---

[3] <u>Baxter</u>, 345 F.3d at 906.

unestablished tort claim plaintiffs rely upon to demonstrate defendants' responsibility to reimburse Medicare.[4]

Neither in their briefing nor at oral argument were plaintiffs able to articulate how an unliquidated, unadjudicated tort claim fits within the language of the MSP when read in its full context.  If Congress had meant to take the significant, additional step of allowing a plaintiff to try to prove a self-insured defendant's state law tort liability within an MSP private right of action, it would have explicitly said so.

In reaching this decision, the Court has carefully considered plaintiffs' various arguments in support of their interpretation of the MSP.  First, plaintiffs rely heavily on the Eleventh Circuit's <u>Baxter</u> decision.  In <u>Baxter</u>, the Eleventh Circuit reversed the district court's dismissal of the government's MSP claim against manufacturers of silicone breast implants that had established a settlement fund to dispose of a class action products liability suit.  <u>Baxter</u>, 345 F.3d at 872.  Although decided prior to the MMA amendments, the Eleventh Circuit adopted a definition of "self-insured plan" in line with the forthcoming MMA amendments.  <u>See</u> <u>id.</u> at 898-

_____

[4]  The Court recognizes that section 1395y(b)(2)(B)(ii) provides that a primary plan's responsibility to reimburse Medicare "<u>may</u> be demonstrated" by a judgment, settlement, or other means.  However, the use of the word "may," when read in the context of the entirety of section 1395y(b)(2)(B)(ii), does not connote an ability to demonstrate responsibility to pay in a manner other than a judgment, settlement, or by other means of like kind.

99.[5]  The Baxter court held that the government could maintain an MSP claim

against the implant manufacturers for reimbursement of Medicare expenditures

even though the manufacturers had already paid some of the settlement claims.

Id. at 899-905.  The court reasoned that "if the [manufacturer] [d]efendants had

either knowledge or constructive knowledge that some of the recipients of the

funds they were paying out had received breast implant-related medical treatment

for which Medicare already paid, then the [manufacturer] [d]efendants would be

liable to reimburse the [g]overnment pursuant to [the MSP]."  Id. at 901-02.  If the

manufacturers' liability in Baxter had neither been adjudicated nor settled and the

Eleventh Circuit had permitted an MSP claim against the manufacturers, Baxter

might be more supportive of plaintiffs' interpretation of the MSP.  However,

because the Eleventh Circuit in Baxter was dealing with an established settlement

fund to pay breast implant claims clearly covered by the MSP as amended, it

provides no support for plaintiffs' attempt to extend the MSP's reach to

unliquidated tort claims.

Plaintiffs also argue that excluding alleged tortfeasors from the reach of the

MSP's private cause of action would render that part of the statute superfluous.

_____

[5]  In so holding, the court relied heavily on the definition of "self-insured plan"
provided in the relevant regulations.  See Baxter, 345 F.3d at 895 (quoting 42 C.F.R.
§ 411.50(b)).  The parties do not cite, and the Court could not locate, any regulations
addressing the issue in this case.

(Doc. 66 at 13-14).  Noting that Medicare benefits are not excluded from tort damages under the common law collateral source rule, plaintiffs assert that "if tort liability had to be established in a separate lawsuit, there would never be a circumstance in which a primary plan failed to make a primary payment (for it would have been compelled to do so in the initial tort suit), and so the private right of action enacted by Congress could never be brought when a Medicare beneficiary was the victim of a tort."  (Doc. 66 at 14).  Even assuming, <u>arguendo</u>, plaintiffs' argument is correct, the MSP's private cause of action provision would not be rendered superfluous because a private cause of action is still available in other circumstances.  <u>See</u> <u>Harris Corp. v. Humana Health Ins. Co. of Fla.</u>, 253 F.3d 598, 605-06 (11th Cir. 2001) (holding that there is a private cause of action under the MSP "in cases involving the failure of an insurance plan to make its coverage primary to Medicare as required by the statute," such as when a private insurer denies "a timely claim for benefits based solely on [a Medicare beneficiary's] eligibility for Medicare").[6]

Plaintiffs contend that, similar to a civil RICO claim, the tort claim here is a predicate element of an MSP claim which need not be established in a separate

_____

[6] Moreover, the purpose of the MSP is to reduce Medicare costs. <u>Baxter</u>, 345 F.3d at 874.  A Medicare beneficiary that recovers from a self-insured tortfeasor for medical expenses that Medicare has paid is required to reimburse Medicare.  42 C.F.R. § 411.24(h) (2004) ("If the beneficiary or other party receives a third party payment, the beneficiary or other party must reimburse Medicare within 60 days.").

lawsuit.  Plaintiffs correctly assert that there is no prior conviction requirement for

the predicate acts that form the basis of a civil RICO claim.  <u>See</u> <u>Sedima, S.P.R.L.</u>

<u>v. Imrex Co.</u>, 473 U.S. 479, 493 (1985).  Civil RICO claims, however, are based in

part on the existence of a "pattern of racketeering activity."  <u>See</u> 18 U.S.C. § 1962.

"Racketeering activity" is in turn defined by a specific list of crimes "<u>chargeable</u>

under State law" or "<u>indictable</u>" under federal law.  <u>See</u> 18 U.S.C. § 1961(1)

(emphasis added).  For example, section 1961(1)(A) provides that "any act or

threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion,

dealing in obscene material, or dealing in a controlled substance or listed chemical

. . . which is <u>chargeable</u> under State law" constitutes "racketeering activity." <u>Id.</u>

(emphasis added). Thus, the RICO statute specifically provides for the

establishment of the predicate acts within the RICO cause of action. By contrast,

the MSP does not contain a list of "chargeable" predicate acts such as "battery" or

"negligence" or other tort claims, but instead requires a primary plan's

responsibility to pay to be "demonstrated" by a judgment, settlement, or other

similar means.  Thus, RICO is not analogous to the MSP.

Plaintiffs also argue that defendants' interpretation of the MSP effectively

erases the provisions for government enforcement.  The Fourth Circuit's decision

in <u>Brown</u> belies this contention.  In <u>Brown</u>, the first published federal appellate

decision to address the MSP after the MMA amendments, a Medicare beneficiary

27

who had recovered a settlement in a medical malpractice action argued that the

MSP did not require her to reimburse Medicare out of her settlement proceeds

because the defendant's self-insurance program did not qualify as a primary plan.

Brown, 374 F.3d at 261.  The Fourth Circuit rejected her argument and held that

the MSP entitled Medicare to reimbursement from the settlement fund for the

payments Medicare made for the plaintiff's medical care as a result of the

malpractice.  Id. at 262.  The court reasoned that "the uncontroverted record

evidence demonstrates that [the hospital] did have what MMA clarifies will suffice

to constitute a self-insured 'primary plan' – an ex ante arrangement to pay for

liability claims."  Id.  Because the plaintiff beneficiary was paid pursuant to this self-

insured plan, Medicare was entitled to reimbursement.  Id.  The MSP, as amended

by the MMA, allows Medicare to bring a cause of action against the beneficiary in

such situations.  See 42 U.S.C. § 1395y(b)(2)(B)(iii) ("[T]he United States may

recover under this clause from any entity that has received payment from a

primary plan or from the proceeds of a primary plan's payment to any entity."); see

also Baxter, 345 F.3d at 901-03 (holding that the government stated a subrogation

claim under the MSP based on allegations that the defendants had constructive

knowledge that some of the recipients of payments from a tort settlement fund had

received treatment for which Medicare had already paid).

Amicus and plaintiffs also urge that adopting defendants' reading of the MSP would fly in the face of Congress's continuing expansion of the MSP regime. See Baxter, 345 F.3d at 877 ("Since enacting the MSP statute, Congress has expanded its reach several times, making Medicare secondary to a greater array of primary coverage sources, and creating a larger spectrum of beneficiaries who no longer may look to Medicare as their primary source of coverage."). This "expansion," reflected in both Brown and Baxter, allows for recovery under the MSP from tort settlements entered into by self-insured entities. Prior to the MMA clarifications, several courts, such as the Fifth Circuit in Goetzmann, did not allow for such a recovery. However, neither the language of the amended MSP nor the legislative history[7] support the expansion that plaintiffs seek.[8]

---

[7] See infra, pp. 31-39.

[8] Plaintiffs also assert that "if tort liability must be proved in a separate individual litigation, which for mass torts could require thousands of lawsuits, the advantage of the MSP action (whether by the government or a private attorney general) for securing a global reimbursement for Medicare would be lost." (Doc. 66 at 15 n.14). Citing the district court in Mason for the proposition that "all of Medicare's overpayments due to a mass tort can be recovered in one MSP action," plaintiffs argue that dismissal of their MSP claim would be "obviously at odds with the remedial purposes and scope of MSP." (Id.). That this is overstatement is shown by Baxter, where the government, by intervening in a class action tort claim after the settlement agreement had been reached, "sought to recover for medical bills it paid on behalf of Medicare beneficiaries who received treatment related to silicone breast implants." Baxter, 345 F.3d at 872. The Baxter court allowed the government, in one MSP action, to attempt to recover all of Medicare's expenditures related to a mass tort claim.

29

Plaintiffs' final argument is that a reading of the MSP as requiring a judgment, settlement, or other similar means of demonstrating responsibility of a primary plan to pay cannot be limited to alleged self-insured tortfeasors, but instead must apply to all types of primary plans.  (Doc. 66 at 15-16).  As an example, plaintiffs contend that if it is alleged that a group health plan is the primary payer, then the responsibility to pay will only arise after its duty to pay is established in a separate adjudication.  Of course, the question of when a private party may bring an MSP claim against a group health plan is not before the Court.  That being said, there is an existing contractual relationship between the primary payer and the beneficiary in plaintiffs' example that does not exist between an alleged tortfeasor and a Medicare beneficiary.  While plaintiffs are correct in asserting that this difference does not matter under the definition of a primary plan, see 42 U.S.C. § 1395y(b)(2)(A)(ii), it may well matter under the MSP's statement of how a primary plan's responsibility to pay may be demonstrated under 42 U.S.C. § 1395y(b)(2)(B)(ii).  As previously discussed, the "by other means" language of this provision indicates other situations where a primary plan has either been required to pay for the item or services covered by the claim or has agreed to do so.  A group health plan, unlike an alleged tortfeasor, has agreed ab initio to cover the beneficiary's health care costs.  Thus, there is a difference, based on the language of the amended MSP, between a self-insured alleged

tortfeasor and a preexisting group health care plan that agrees to provide primary health care coverage for a beneficiary.

Thus, plaintiffs may not maintain their MSP claim against defendants because they cannot "demonstrate" that these defendants are "responsible" to pay under the MSP.  After conducting its own independent analysis, the Court agrees with the Second Circuit's statement that the MMA amendments to the MSP "do not alter the principle . . . that MSP liability attaches only to an entity that is required or responsible to pay under a 'primary plan' . . . , a principle inapplicable to . . . alleged tortfeasors." (Doc. 65, Ex. B) (quoting Mason, 346 F.3d at 42) (quotations omitted).  The language of the MSP, as amended by the MMA, simply does not support plaintiffs' private cause of action where the underlying tort liability is unresolved and defendants' responsibility to pay Medicare has not been established by a judgment, settlement, or other means of "like kind."  Baxter, 345 F.3d at 906.

### 2.  The Legislative History of the 2003 MMA Amendments

The Eleventh Circuit has instructed that "where the meaning of a statute is discernible in light of canons of construction, [courts] should not resort to legislative history or other extrinsic evidence."  CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1225 (11th Cir. 2001).  However, plaintiffs and amicus insist that interpreting the MSP's language as the Court has would nullify Congress's intent in

enacting the MMA amendments.  (Doc. 72 at 3-8).  Thus, the Court will review the legislative history of the 2003 MMA amendments to the MSP only to determine whether there is such history contrary to the Court's reading of the MSP.

Before examining the legislative history, the Court notes that while the MMA amendments to the MSP are the focus of this litigation, amending the MSP was not Congress's primary focus in enacting the MMA.  See Pub. L. No. 108-173, 117 Stat. 2066 (2003).  The MMA included, among other significant changes to the Medicare program, the addition of voluntary prescription drug coverage.  Id. Indeed, while the legislative history of the MMA is voluminous, the parties cite and the Court could locate only scant legislative history addressing the MMA amendments to the MSP.

Prior to the MMA's enactment, the government unsuccessfully sought to recover Medicare expenditures under the MSP in cases involving settled tort claims.  See Thompson v. Goetzmann, 315 F.3d 457, 469-70 (5th Cir. 2002) (holding that the government could not recover under the MSP based upon a beneficiary's settlement of a products liability claim with a manufacturer); Fanning v. United States (In re Orthopedic Bone Screw Prods. Liab. Litig.), 202 F.R.D. 154, 163-69 (E.D. Pa. 2001) (government could not recover under the MSP based upon the settlement of a class action tort claim against an orthopedic bone screw manufacturer); Brown v. American Home Prods. Corp. (In re Diet Drugs), Nos.

32

MDL 1203, CIV.A. 99-20593, 2001 WL 283163, at *9-12 (E.D. Pa. Mar. 21, 2001) (government could not recover under the MSP from a settlement fund established as a result of a mass tort claim).  These cases based their conclusions on two portions of the MSP: the definition of a "self-insured plan" and the language allowing Medicare to be reimbursed for expenditures that were made when a primary plan was "reasonably expected" to pay "promptly."  See Goetzmann, 315 F.3d at 460-68.  With respect to their "self-insured plan" holdings, these courts required an "entity's ex ante adoption, for itself, of an arrangement for (1) a source of funds and (2) procedures for disbursing these funds when claims are made against the entity."  Id.; see also Fanning, 202 F.R.D. at 166; American Home Prods. Corp., 2001 WL 283163, at *10.  As for their reliance on the MSP's use of "promptly," these courts reasoned that:

> Given the time delay inherent in strongly prosecuted and defended tort litigation, the Government cannot legitimately assert that a settlement arrived at in the heat of a hard fought adversarial engagement for alleged tort liability from a defective product is the type of insurance 'plan' that the Government can reasonably expect to make prompt payment for medical care.

Goetzmann, 315 F.3d at 467-68 (quoting Fanning, 202 F.R.D. at 167);[9] see also

---

[9] On petition for rehearing, the Fifth Circuit withdrew its prior opinion with respect to its "prompt payment" holding but adhered to its "self-insured plan" holding. Goetzmann, 337 F.3d at 492-93.  The court noted, however, that it "remain[ed] convinced that the plain language of the MSP statute makes the reasonable expectation of prompt payment a requirement for the government's collection from

American Home Prods. Corp., 2001 WL 283163, at *11 n.20.

It is clear from the legislative history that it was these holdings that the MMA

amendments to the MSP were meant to address.  The House Committee on Ways

and Means July 15, 2003 report gave the following reasons for the amendments:

> Recent court decisions such as Thompson v. Goetzmann resulted in a narrow interpretation of the statutory reference to "promptly."  Liability insurers would have been able to draw out their settlements and avoid repaying Medicare for payment of medical expenses.  Moreover, firms that self-insure for product liability would have been able to avoid paying Medicare for past medical payments related to the claim.

H.R. Rep. 108-178(II) (2003).  The committee report further explained the MMA

amendments:

> The Secretary would be able to make a Medicare payment if a [payment from a primary plan] has not been made or cannot reasonably be expected to be made promptly. . . . This payment would be contingent on reimbursement by the primary plan to the Medicare Trust Funds.
> The list of primary plans for which conditional payment could be made would be expanded; an entity engaging in a business, trade, or profession would be deemed as having a self-insured plan if it carries its own risk.  Failure to obtain insurance would be required as evidence of carrying risk.  A primary plan, as well as an entity that receives payment from a primary plan, would be required to reimburse the Medicare Trust Funds for any payment made by the Secretary if the primary plan was obligated to make payment.

---

those 'primary plans' listed in [the MSP]."  Id. at 492.

34

Id. (emphasis added).[10]

The legislative history also includes two relevant statements by the

Department of Justice ("DOJ").  Before the House Ways and Means Committee on

July 17, 2003, William H. Jordan, Senior Counsel to the Assistant Attorney General

for the Civil Division, testified in favor the MMA amendments to the MSP:

> Finally, I would like to restate the Department's support for section 301 of H.R. 1, the 'Medicare Prescription Drug and Modernization Act of 2003,' which would protect the integrity of the Medicare Trust Fund by clarifying that Medicare must be reimbursed whenever another insurer's responsibility to pay has been established.  This section is consistent with the litigation positions taken by this Department and the Department of Health and Human Services in numerous court cases.
>
> Congress enacted the Medicare Secondary Payer ("MSP") statute in 1980 to protect the fiscal integrity of the Medicare program by making Medicare a secondary, rather than a primary, payer of health benefits.  To ensure that Medicare would be secondary, Congress precluded it from making payment when a primary plan has already made payment or can reasonably be expected to pay promptly.  Congress recognized, however, that in contested cases, payments under such plans would be delayed.  To protect providers, suppliers, and beneficiaries, Congress authorized Medicare to make a "conditional" payment when prompt resolution of a claim cannot reasonably be expected.  The Medicare Trust Fund must be reimbursed, however, once the primary insurer's obligation to pay is demonstrated.
>
> Some recent court decisions have held, however, that Medicare has no right to reimbursement unless the primary insurer could reasonably have been expected to make

_____

[10]  The November 21, 2003 conference report adopts the same interpretation of the MMA amendments.  See H.R. Conf. Rep. 108-391 (2003).

prompt payment at the outset.  <u>See</u>, <u>e.g.</u>, <u>Thompson v. Goetzmann</u>, 315 F.3d 457 (5th Cir. 2002); <u>Fanning v. United States</u>, 202 F.R.D. 154 (E.D. Pa. 2001).  These rulings make the statute's reimbursement mechanism inoperative in some jurisdictions.  Section 301 of this legislation would end this costly litigation and provide clear legislative guidance regarding Medicare's status as a secondary payer of health benefits. . . .

<u>Waste, Fraud, and Abuse</u>: <u>Hearing Before the House Comm. on Ways and Means</u>, 108th Cong. 88 (2003) (statement of William H. Jordan, Senior Counsel to the Asst. Atty. Gen.), <u>available at</u> 2003 WL 21667339 (emphasis added).  The second DOJ statement is a letter from the Office of Legislative Affairs that was read into the congressional record during debate in the Senate.  This letter, written by Assistant Attorney General William E. Moschella and addressed to the Chairman of the House Committee on Energy and Commerce, stated that the MMA amendments to the MSP clarify "that Medicare must be reimbursed whenever another insurer's responsibility to pay <u>has been established</u>."  149 Cong. Rec. S8499, S8535 (daily ed. June 25, 2003). Mr. Moschella's letter echoes Mr. Jordan's statement that "[t]he Medicare Trust Fund must be reimbursed . . . <u>once the primary insurer's obligation to pay is demonstrated</u>."  <u>Id.</u> (all emphasis supplied).

Thus, the legislative history does not support the idea that the 2003 amendments to the MSP create the cause of action plaintiffs attempt to allege in their First Amended Complaint.  First, only two cases are mentioned in the

36

legislative history (<u>Goetzmann</u> and <u>Fanning</u>), both of which involved the government's efforts to recover, under the MSP, proceeds of a settlement in a tort case.  Absent from both the committee reports and the DOJ's statements is any reference to the <u>Philip Morris</u> or <u>Mason</u> cases.  Second, the DOJ viewed the amendments as requiring reimbursement only after "responsibility to pay has been established."  Finally, there is no statement anywhere in the legislative history indicating that the amendments were meant to subject an alleged tortfeasor – an entity that has neither settled a tort claim nor been adjudicated as responsible for the Medicare beneficiary's injuries – to a private right of action under the MSP for double damages.  The absence of legislative history supporting plaintiffs' interpretation of the MSP is more significant when one considers the consequences of plaintiffs' position, namely that virtually every state law tort claim involving a Medicare beneficiary would become a federal lawsuit for double damages under the MSP.  It is unlikely that Congress intended to create such a cause of action under the MSP but failed to mention anything about it in the legislative history.

Senator Grassley, appearing as <u>amicus</u>, argues that the "notion that an alleged tortfeasor may not be sued under the MSP is wrong, and should be rejected."  (Doc. 72 at 8).  The Court has the utmost respect for Senator Grassley and acknowledges his expertise in this area.  Nevertheless, the position Senator

Grassley espouses in his brief is unsupported in the legislative history.  Senator

Grassley cites, and the Court could locate, only one statement made by the

Senator in support of the 2003 amendments:

> While the False Claims Act is one of our best weapons in
> the war on fraud and abuse, our policies in this new
> language of the title III conference agreement adds still
> more weapons to our arsenal.  First, we make important
> technical clarifications to existing law that strengthen and
> improve what is known as the secondary payer statute.
> The purpose of the statute is to ensure that Medicare pays
> first for seniors' medical needs when other sources should
> be, in fact, paying instead of the taxpayer paying.
> These other sources include, for instance, employer
> coverage.  In addition, when a Medicare beneficiary is
> injured by wrongful conduct of another entity, that entity's
> liability insurance or the entity itself, if it has no insurance,
> or it might be self-insured, is always required to pay first
> instead of having the taxpayers pay.  The provisions in title
> III do not change existing law in this area but, in fact, clarify
> the intent of Congress in protecting Medicare's resources.

149 Cong. Rec. S15574, S15584-S15585 (daily ed. Nov. 22, 2003) (statement of

Senator Grassley).[11]  This statement does not address the cause of action plaintiffs

attempt to bring in this case and is consistent with the Court's interpretation of the

MSP's language. Moreover, the Court is not permitted to accept Senator

Grassley's statements in his <u>amicus</u> brief that Congress intended to create the

cause of action plaintiffs assert here when neither the wording of the statute nor

the legislative history supports that construction.  <u>See</u> <u>Blanchette v. Connecticut</u>

---

[11]  This statement is also the only legislative history cited by plaintiffs.

38

Gen. Ins. Corps., 419 U.S. 102, 132 (1974) (holding that the post-passage remarks of Congressmen, in both oversight hearings and an amicus brief, were irrelevant to the statutory construction question because "post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress"). Thus, the legislative history provides no clear indication that Congress, by enacting the 2003 amendments to the MSP, intended to create a private cause of action based on unadjudicated and unresolved tort claims.  Indeed, if anything, the legislative history is supportive of the Court's reading of the statute.

## IV.  Conclusion

The Court has endeavored to avoid the competing public policy arguments the parties have made as to why the MSP should be interpreted as that respective party suggests.  It is not for this Court to decide the appropriate scope of the MSP; that is for Congress.  The Court has simply attempted to apply the words of this complex statute, in context, to the allegations of plaintiffs' First Amended Complaint.

Accordingly, it is hereby **ORDERED:**

Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 57) is **GRANTED WITH PREJUDICE**.  The Clerk shall enter judgment in favor of defendants Philip Morris USA and Liggett Group, Inc. and

close the file.[12]

      **DONE AND ORDERED** at Jacksonville, Florida this <u>26th</u> day of July, 2005.

TIMOTHY J. CORRIGAN
United States District Judge

j.
copies:
counsel of record

_____

[12]   Ordinarily, the Court would grant plaintiffs leave to amend their complaint. However, plaintiffs' counsel stated at oral argument that the issue presented by defendants' motion to dismiss is dispositive and could not be cured by amendment. Thus, dismissal with prejudice will expedite plaintiffs' ability to appeal this decision.